IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **SONIA JENKINS,** ) | FILED: MAY 21, 2008 |
| ) | 08CV2935       TC |
| **on behalf of herself and** ) | JUDGE COAR |
| **the classes defined herein,** ) | |
| ) | MAGISTRATE JUDGE KEYS |
| **plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **COUNTRYWIDE HOME LOANS, INC.,** ) | |
| **d/b/a AMERICA'S WHOLESALE LENDER,** ) | |
| ) | **JURY DEMANDED** |
| **defendant.** ) | |

## COMPLAINT

Plaintiff Sonia Jenkins ("Ms. Jenkins") by her undersigned attorney, alleges as follows:

1.      This is an action brought by Ms. Jenkins, an individual, against Countrywide Home Loans, Inc. d/b/a America's Wholesale Lender ("Countrywide") under the Equal Credit Opportunity Act, 15 U.S.C. § 1691, et seq. ("ECOA") and the Fair Housing Act, 42 U.S.C. § 3601 et seq.  Ms. Jenkins seeks remedies for the discriminatory effects of Countrywide's home financing policies and practices.

2.      As described below, Countrywide has established a specific, identifiable and uniform credit pricing system, a component of which, referred to herein as the Discretionary Pricing Policy, authorizes unchecked, subjective surcharge of additional points and fees to an otherwise objective risk-based financing rate.  In other words, after a finance rate acceptable to Countrywide is determined by objective criteria (e.g., the individual's credit history, credit score, debt-to-income ratio and loan-to-value ratios), Countrywide's credit pricing policy authorizes

1

additional discretionary finance charges.  These subjective, additional finance charges had a discriminatory impact on Ms. Jenkins, in violation of ECOA and the FHA.

     3.     Countrywide has established policies for retail and wholesale access to its loan products that subjected Ms. Jenkins to a significantly higher likelihood of exposure to discretionary points, fees and interest mark-ups.  These costs drove up the cost of Ms. Jenkins' mortgage loan.

     4.     Ms. Jenkins seeks damages, declaratory and injunctive relief, disgorgement and restitution of monies.

## JURISDICTION AND VENUE

     5.     Ms. Jenkins invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under federal law.

     6.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) inasmuch as Countrywide regularly conducts business in this District, and Ms. Jenkins resides in this district.

## PARTIES

     7.     Plaintiff, Ms. Jenkins, is an African-American homeowner who resides at 8640 S. Kenwood Avenue, Chicago, Illinois 60619.

     8.     Defendant, Countrywide Home Loans, Inc. ("Countrywide Home Loans") is a mortgage lender with a principal place of business at 4500 Park Granada Blvd., Calabasas, California, 91302.  Countrywide Home Loans does business throughout the U.S., including in Illinois.  Its registered agent name and address are Prentice Hall Corporation, 33 North LaSalle Street, Chicago, IL 60602.

## FACTS

**A.    MORTGAGE LENDING IN THE UNITED STATES HISTORICALLY HAS DISCRIMINATED AGAINST MINORITIES LIKE MS. JENKINS**

9. According to a study by the Joint Center for Housing Studies at Harvard University, mortgage lending discrimination today is subtle but pervasive, with minority consumers continuing to have less-than-equal access to loans at the best price and on the best terms that their credit history, income, and other individual financial considerations merit more than three decades after the enactment of national fair lending legislation. William C. Apgar & Allegra Calder, *The Dual Mortgage Market: The Persistence of Discrimination in Mortgage Lending*, Joint Center for Housing Studies of Harvard University, December 2005, *available at* www.jchs.harvard.edu/publications/finance/w05-11.pdf.

10. The passage of civil rights legislation and fair lending laws in the 1960s and 1970s brought an end to the most virulent forms of overt racial discrimination in the housing markets, but throughout the 1980s and 1990s, mortgage lenders found more subtle ways to discriminate, including maintaining offices only in white neighborhoods and engaging in practices such as redlining (refusing to lend on properties in predominantly minority neighborhoods).

11. After such redlining practices were challenged in the 1990s, mortgage lenders changed tactics once again, making loans to minorities, but charging higher interest rates and loan-related fees than they charged to similarly-situated white borrowers. Loan data that mortgage lenders must now compile and disclose under the federal Home Mortgage Disclosure Act ("HMDA") reveals profound loan pricing disparities between minority borrowers and similarly-situated white borrowers.

12. HMDA requires mortgage lenders to report information about the home loans they process each year. In 2005, lenders reported information on more than 30 million home loan applications pursuant to HMDA. In 1989, Congress required lenders to begin disclosing information about mortgage borrowers' race and ethnicity. In 2004, concerned with potential racial discrimination in loan pricing and recognizing that racial or other types of discrimination can occur when loan officers and mortgage brokers have latitude in setting interest rates, the Federal Reserve Board began requiring lenders to also report information concerning rates, points, and fees, charged to borrowers on high-cost loans.

13. According to the Federal Reserve, both 2004 and 2005 HMDA data revealed that "Blacks and minority borrowers were more likely . . . to have received higher-priced loans than non-minority whites. . . . [which has] increased concern about the fairness of the lending process." Robert B. Avery, Kenneth P. Brevoort & Glenn B. Canner, *Higher-Priced Home Lending and the 2005 HMDA Data,* 2006 Federal Reserve Bulletin, A124, A159 (revised Sept. 18, 2006), *available at* http://www.federalreserve.gov/pubs/bulletin/2006/hmda/bull06hmda.pdf.

14. HMDA data for 2004 reveals profound loan pricing disparities between minority borrowers and non-minority whites even after controlling for borrowers' gender, income, property location, and loan amount. After accounting for those differences in the 2004 HMDA data, minority borrowers were still almost twice as likely to receive a higher-rate home loan as non-minority whites. *Testimony of Keith Ernst before the Subcommittee on Financial Institutions and Consumer Credit*, June 13, 2006 at 3, *available at* http://www.responsiblelending.org/pdfs/Testimony-Ernst061306.pdf. In an October 2006 speech, the Vice-Chairman of the Federal Deposit Insurance Corporation, Martin Gruenberg, noted that 2004 HMDA data "clearly indicated" that minority borrowers are more likely to

receive high-cost home loans than are non-minority whites.  Martin J. Gruenberg, FDIC Vice-Chairman, Address to the Conference on Hispanic Immigration to the United States:  Banking the Unbanked Initiatives in the U.S. (Oct. 18, 2006) *available at* http://www.fdic.gov/news/news/speeches/archives/2006/chairman/spoct1806.html.

15. Likewise, HMDA data for 2005 shows that "for conventional home-purchase loans, the gross mean incidence of higher-priced lending was 54.7 percent for blacks and 17.2 percent for non-minority whites, a difference of 37.5 percentage points."  Avery et al., *supra*, at A159.  The situation is similar for refinancing, where there is a difference of 28.3 percentage points between blacks and non-minority whites.  *Id.* at A124, A159.

16. A growing number of research studies and investigations show that significant racial disparities still exist in lending practices.  *See, e.g.,* California Reinvestment Coalition, et al., *Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending*, (March 2007) *available at* http://www.nedap.org/pressroom/documents/2007_Report-2005_HMDA.pdf, (hereinafter "2007 CRC Report"); Stephen L. Ross, *The Continuing Practice and Impact of Discrimination*, (Revised July 2006) (Univ. of Connecticut, Working Paper 2005-19R), *available at* http://www.econ.uconn.edu/working/2005-19r.pdf.

17. Recently, the California Reinvestment Coalition, jointly with several other non-profit and housing advocacy groups, published another report.  The organizations examined the impact of lending by subprime, lenders in 7 metropolitan areas – Boston, Charlotte, Chicago, Cleveland, Los Angeles, New York City and Rochester, NY. California Reinvestment Coalition, et al., *Paying More for the American Dream:  The Subprime Shakeout and its Impact on Lower-Income and Minority Communities*, (March 2008), *available at*

http://www.nedap.org/documents/MultistateHMDAreport-Final21.pdf, (hereinafter "2008 CRC Report").

18. Among other things, the study showed that subprime lenders are concentrated in minority neighborhoods. Data supporting this finding demonstrated that subprime lenders had 20% of the market share in predominantly minority neighborhoods in the metro areas studied, compared to a 4% market share in predominantly white neighborhoods. *See* 2008 CRC Report at 5. In addition, over 40% of the loans made by subprime lenders were in neighborhoods where 80% or more of the residents were minorities. *Id.* In stark contrast, less than 10% of subprime lender loans were in areas where less than 10% of the residents were minorities. *Id.*

19. In metro Chicago, where Ms. Jenkins resides, the same study shows that subprime lenders had 20.5% of the home loan market in neighborhoods where more than 80% of the residents were minorities, while subprime lenders had only 5.6% of the market for home loans in neighborhoods where less than 10% of the residents were minorities. 2008 CRC Report at 17.

20. The Association of Community Organizations for Reform Now (ACORN) released a report in 2005, finding that "[i]n every metropolitan area where at least 50 refinances were made to African-American homeowners, African-Americans were more likely to receive a high-cost loan than White homeowners." ACORN Fair Housing, *The High Cost of Credit: Disparities in High-priced Refinanced Loans to Minority Homeowners in 125 American Cities*, September 27, 2005, at 11, *available at*
http://www.acorn.org/fileadmin/Afforable_Housing/hmda/High_Cost_of_Credit_Report.doc.

21. Moreover, and importantly, research studies have suggested that borrowers' credit profiles cannot fully explain why some borrowers, and not others, are saddled with higher cost loans. Researchers have raised "doubts that risk can adequately explain racial differences" in

6

high-cost loans.  Calvin Bradford, Center for Community Change, *Risk or Race? Racial Disparities and the Subprime Refinance Market,* (May 2002), *available at* http://www.knowledgeplex.org/kp/report/report/relfiles/ccc_0729_risk.pdf.  In other words, evidence "suggests that weak borrower credit profiles do not fully explain why some borrowers get stuck with higher-cost home loans."  2007 CRC Report, *supra* at 7.

B.   **COUNTRYWIDE'S DISCRETIONARY PRICING POLICY CONTINUES THE PERVASIVE DISCRIMINATION AGAINST MINORITIES IN MORTGAGE LENDING**

22.   Countrywide is one of the largest mortgage-lending companies in the United States. Countrywide recently was examined in a study conducted by the California Reinvestment Coalition, Community Reinvestment Association of North Carolina, Empire Justice Center, Massachusetts Affordable Housing Alliance, Neighborhood Economic Development Advocacy Project, and the Woodstock Institute in March of 2007 ("2007 Joint Report").[1] The study discussed higher cost home purchase lending in six metropolitan areas, (including Chicago, where Ms. Jenkins resides) during 2005 and found significant disparities made to minority and white borrowers.

23.   The 2007 Joint Report included specific Countrywide data relating to disparities. It showed that on average in the six metropolitan areas, blacks are almost 5 times more likely to receive a high APR Countrywide purchase money loan than whites. *Id.* p. 10. (Table 2). In Chicago specifically, blacks are almost 5.6 times more likely to receive a high APR Countrywide purchase money loan than whites. *Id*.

24.   Based on the latest available Home Mortgage Disclosure Act ("HMDA") data, available from the Department of Housing and Urban Development, blacks who borrower from

---

[1] Income Is No Shield Against Racial Differences In Lending," available at http://ncrc.org.

7

Countrywide are over three times more likely than whites to have received a high-APR loan to purchase a home and over two times more likely to have received a high-APR loan to refinance their home.

25. In December 2006, Countrywide agreed to settle regulatory allegations in New York State that its practices result in discrimination against minority borrowers. *See*, Press Release, Office of the New York Attorney General, "Countrywide Agrees To New Measures To Combat Racial And Ethnic Disparities In Mortgage Loan Pricing" (Dec. 5, 2006), available at http://www.oag.state.ny.us/press/2006/dec/dec05a 06.html.

26. Countrywide publicly promotes its home financing expertise by means of nationwide advertising campaigns. In its advertisements, Countrywide solicits persons to apply for financing with Countrywide either in one of its offices or through one of the mortgage brokers who Countrywide has authorized to accept applications on its behalf.

27. Countrywide makes home-mortgage loans directly to consumers through its various subsidiaries.

28. Countrywide also makes home-mortgage loans that are arranged by its network of mortgage brokers. Brokers make these loans in reliance on Countrywide's credit-granting policies and with Countrywide's participation.

29. Countrywide's policies as to where to place its offices and how to market its products show that it was targeting minority borrowers like Ms. Jenkins for subprime loans.

30. Countrywide's loans are priced based on its internal policies.

31. Countrywide participated in determining the terms of credit available to Ms. Jenkins including, without limitation, by targeting Ms. Jenkins and by making the Discretionary Pricing Policy applicable to its loans.

32. Countrywide's Discretionary Pricing Policy was unrelated to Ms. Jenkins' objective credit characteristics such as credit history, credit score, debt-to-income ratio and loan-to-value ratios and results in purely subjective charges that affected the rate otherwise available to Ms. Jenkins.

33. Countrywide provided its mortgage brokers with substantial information about its loan programs, rates and credit criteria, as well as its policies for compensation.

34. Countrywide's network of mortgage brokers accepted applications, quoted financing rates and terms (within the limitations set by Countrywide), informed credit applicants of Countrywide's financing options and originated finance transactions using Countrywide's forms, in accordance with Countrywide's policies.

35. Countrywide provided its mortgage brokers with credit applications, loan contracts and other required financing forms, as well as instructions on filling out those documents necessary to complete home mortgage transactions.

36. After Ms. Jenkins provided credit information to one of Countrywide's mortgage brokers, Countrywide computed a financing rate through an objective credit analysis that, in general, discerned the creditworthiness of Ms. Jenkins.

37. Countrywide's credit analyses considered numerous risk-related variables of creditworthiness, including credit bureau histories, payment amounts, debt ratio, bankruptcies, automobile repossessions, charge-offs, prior foreclosures, payment histories, credit score, debt-to-income ratios, loan-to-value ratios and other risk-related attributes or variables.  On information and belief, Countrywide and/or its mortgage brokers used these variables to determine a "mortgage score" for Ms. Jenkins.

38. Based on these objective risk-related variables and the resulting mortgage score, Countrywide and/or its mortgage brokers derived a risk-based financing rate at which it would provide a home mortgage, often called the "Par Rate." Alternatively, experienced Countrywide employees and/or Countrywide's mortgage brokers estimated the risk-related Par Rate by referring to Ms. Jenkins' credit bureau determined credit score.

39. Although Countrywide's initial analysis applied objective criteria to calculate this risk-related Par Rate, Countrywide then authorized a subjective component in its credit pricing system —the Discretionary Pricing Policy — to impose additional non-risk charges. On information and belief, the applicable Par Rates and authorized discretionary charges were communicated by Countrywide to its mortgage brokers via regularly published "rate sheets."

40. Ms. Jenkins paid the discretionary charges as a component of the total finance charge (the "Contract APR"), without knowing that a portion of her contract APR was a non-risk-related charge.

41. Countrywide's mortgage brokers had discretion, within the limits set by Countrywide, to impose discretionary mark-ups as additional points in interest – "a rate mark-up", or as points and fees on the loan. When there was a rate mark-up, such as on Ms. Jenkins' loan, Countrywide received additional income.

42. On information and belief, Countrywide's mortgage brokers received compensation based, in part, on the amount of discretionary charges added to Ms. Jenkins' loan. This compensation scheme served as an incentive for mortgage brokers to mark-up Ms. Jenkins' loan.

43. Countrywide's Discretionary Pricing Policy, by design, caused Ms. Jenkins to pay a different amount for the cost of credit than white borrowers with identical or similar credit

scores. As a result of using a subjective pricing component that is designed to charge persons with the same credit profiles different amounts of finance charge, the objective qualities of the initial credit analysis used to calculate the Par Rate are undermined and the potential for race bias became inherent in the transaction.

44. The Discretionary Pricing Policy, although facially neutral (insofar as the Countrywide uses the same or effectively the same policy for all credit applicants), had a disproportionately adverse effect on Ms. Jenkins compared to similarly situated whites in that Ms. Jenkins paid disparately more discretionary charges (both in frequency and amount) than whites with similar credit qualifications. Statistical analyses of discretionary charges imposed on minority and white customers of mortgage companies that use credit pricing systems structured like Countrywide's have revealed that minorities like Ms. Jenkins, after controlling for credit risk, are substantially more likely than similarly situated whites to pay such charges.

45. The Discretionary Pricing Policy constitutes a pattern and practice that had an ongoing effect of discrimination against minority homeowners like Ms. Jenkins by way of disparate impact. The pattern and practice continues.

46. Mortgage brokers are Countrywide's agents for the purpose of setting credit price, which always was set based on the Countrywide's policy.

47. The disparate impact Ms. Jenkins suffered is a direct result of Countrywide's Discretionary Pricing Policy in that the Countrywide designed, disseminated, controlled, implemented and profited from the Discretionary Pricing Policy creating the disparate impact.

48. Countrywide has a non-delegable duty to ensure that its mortgage financing structure and policies do not have a disparate impact on legally protected classes, such as blacks. Despite having such a non-delegable duty, Countrywide chose to use a commission-driven,

11

subjective pricing policy that it knew or should have known had a significant and pervasive adverse impact on Ms. Jenkins.

49. The disparities between the terms of Countrywide's transaction involving Ms. Jenkins and the terms involving whites borrowers with similar credit qualifications cannot be a product of chance and cannot be explained by factors unrelated to race, but, instead, are the direct causal result of the use of the discriminatory Discretionary Pricing Policy.

50. There are no legitimate business reasons justifying Countrywide's discriminatory Discretionary Pricing Policy that could not be achieved by a policy that has no discriminatory impact or a greatly reduced discriminatory impact.

**C. THE DEFENDANTS' DISCRETIONARY PRICING POLICY DISCRIMINATED AGAINST MS. JENKINS**

51. Ms. Jenkins is black homeowner who resides at 8640 S. Kenwood Avenue, Chicago, Illinois 60619.

52. On or about April 20, 2007, Ms. Jenkins entered into a mortgage loan transaction with Countrywide. The principal amount of the loan was in the amount of $154,00.00 (Loan # 167628984).

53. Barrister Mortgage brokered the loan.

54. The loan was a "2 Yr Hybrid LIBOR" adjustable rate mortgage with an initial introductory period of 2 years. The interest rate during the introductory period was 8.850%, subject to change every 6 months after the introductory period. After factoring the associated costs of the loan, the Annual Percentage Rate was 10.688%.

55. As part of the refinance, Ms. Jenkins paid various Settlement Charges, amounting to $8,870.00. These fees included a $3,750.00 "Broker Origination Fee" to Barrister Mortgage, a

$500.00 "Broker Processing Fee" to Barrister Mortgage, a $500.00 "Administration Fee" to Barrister Mortgage, and a $695.00 underwriting fee to Countrywide.

56. In connection with the loan, Countrywide also paid Barrister Mortgage a yield spread premium in the amount of $1,540.00 representing additional commission based on a marked up rate.

57. True and correct copies of Truth-in-Lending disclosure and HUD-One Settlement Statement provided in connection with Ms. Jenkins' loan are attached hereto and labeled <u>Exhibit 1</u> and <u>Exhibit 2</u>, respectively.

58. On information and belief, unbeknownst to Ms. Jenkins, the contract APR on the mortgage loan was actually a combination of an objective, risk-based calculation and a totally subjective, discretionary component added pursuant to the Countrywide's Discretionary Pricing Policy.

59. Countrywide did not offer Ms. Jenkins its less expensive loan products that were available to borrowers with similar credit characteristics.

60. On information and belief, Ms. Jenkins was subject to the Countrywide's Discretionary Pricing Policy.

61. On information and belief, Countrywide charged Ms. Jenkins a disproportionately greater amount in non-risk-related credit charges than it charges similarly situated white persons.

## COUNT I
**DISCRIMINATION IN VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT**

62. Ms. Jenkins repeats and re-alleges every allegation above as if set forth herein in full.

63. Countrywide is a creditor as defined in ECOA, and in the ordinary course of its business, participated in the decision of whether or not to extend credit to Ms. Jenkins.

64. Countrywide designed, disseminated, controlled, implemented and profited from the discriminatory policy and practice alleged herein — the Discretionary Pricing Policy — which has had a disparate economic impact on Ms. Jenkins compared to similarly situated whites.

65. All actions taken by Countrywide's employees and agents were in accordance with the specific authority granted to them by Countrywide and were in furtherance of the Countrywide's policies and practices.

66. As a result of the Countrywide's Discretionary Pricing Policy, Countrywide has collected more in finance charges from Ms. Jenkins than from similarly situated white persons, for reasons unrelated to credit risk.

67. Countrywide's Discretionary Pricing Policy violates the Equal Credit Opportunity Act.

68. Ms. Jenkins is an aggrieved person as defined in ECOA by virtue of having been subject to the Countrywide's discriminatory Discretionary Pricing Policy.

## COUNT II
## DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT

69. Ms. Jenkins repeats and re-alleges every allegation above as if set forth herein in full.

70. Countrywide engaged in a residential real estate-related transaction with Ms. Jenkins.

71. Countrywide's Discretionary Pricing Policy has resulted in discrimination with respect to the Ms. Jenkins.

72. As a result of the Countrywide's Discretionary Pricing Policy, Countrywide has collected more in finance charges from Ms. Jenkins than from similarly situated white persons, for reasons unrelated to credit risk.

73. Countrywide's Discretionary Pricing Policy violates the Fair Housing Act and constitutes actionable discrimination on the basis of race.

74. Ms. Jenkins is an aggrieved person as defined in FHA by virtue of having been subject to the Countrywide's discriminatory, Discretionary Pricing Policy.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Jenkins respectfully requests the following relief:

a. Enter a judgment, pursuant to 15 U.S.C. §1691e(c) and/or 42 U.S.C. §3613, declaring the acts and practices of Countrywide complained of herein to be in violation of ECOA and the FHA;

b. Grant a permanent or final injunction, pursuant to 15 U.S.C. 1691e(c) and/or 42 U.S.C. §3613(c), enjoining Countrywide, and Countrywide's agents and employees, affiliates and subsidiaries, from continuing to discriminate against Ms. Jenkins because of her race through further use of the Discretionary Pricing Policy or any other non-risk-related discretionary pricing policy employed by Countrywide;

c. Order Countrywide, pursuant to 15 U.S.C. §1691e(c) and/or 42 U.S.C. §3613(c), to adopt and enforce a policy that requires appropriate training of the Countrywide's employees and its brokers and agents to prevent discrimination;

  d. Order disgorgement, pursuant to 15 U.S.C. §1691e(c), of all disproportionate non-risk charges imposed on Ms. Jenkins by Countrywide's Discretionary Pricing Policy; and order the equitable distribution of such charges to Ms. Jenkins; together with other relief for unjust enrichment;

  e. Order actual and punitive damages and/or restitution to Ms. Jenkins pursuant to 42 U.S.C. § 3613(c);

  f. Award Ms. Jenkins the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees, pursuant to 15 U.S.C. § 1691e(d) and/or 42 U.S.C. § 3613(c); and

  g. Grant Ms. Jenkins such other and further relief as this Court finds necessary and proper.

## JURY TRIAL DEMANDED

Ms. Jenkins respectfully demands a trial by jury on all issues so triable.

      Respectfully submitted
      on behalf of Ms. Jenkins,


      *s/Al Hofeld, Jr.*
      Al Hofeld, Jr.
      LAW OFFICES OF AL HOFELD, JR., LLC
      AND THE SOCIAL JUSTICE PROJECT, INC.
      208 S. LaSalle Street, Suite #1650
      Chicago, IL 60604
      Phone (312) 345-1004
      Fax (312) 346-3242

Dated: May 21, 2008